LUIS GRANADOS,

        Plaintiff,

    v.                                   Case No. 19-C-1277

EDWARD DREWITZ,

        Defendant.

## DECISION AND ORDER

Plaintiff Luis Granados, who is representing himself, alleges that Defendant Deputy Edward Drewitz violated his Eighth Amendment rights when he failed to protect him from an assault by another inmate at the Racine County Jail. Dkt. No. 10 at 3. On August 14, 2020, Deputy Drewitz filed a motion seeking summary judgment on the ground that Granados failed to exhaust his administrative remedies, and in the alternative, on the merits. Dkt. No. 37. For the reasons explained below, the Court will grant the motion for summary judgment and dismiss this case.

## BACKGROUND

Granados is an inmate at the Green Bay Correctional Institution (GBCI). For three days in May 2016, Granados was transferred to the Racine County Jail for a court appearance. Dkt. No. 38, ¶1. Deputy Drewitz, who is normally a patrol deputy for Racine County, was assigned to work at the jail at the relevant time. *Id*., ¶¶2-3.

While at the jail, Granados was assigned to "Administrative Segregation," which is on floor 4B and consists of eight inmate cells and Dayroom #2. *Id*., ¶¶2, 7-10. Inmates are given one hour out of their cells each day for recreation in the dayroom. *Id*., ¶¶7-8. Only one inmate can be in the dayroom at a time and the other inmates' cells are closed and secured. *Id*., ¶¶9-10.

At 4:47:08 p.m. on May 9, 2016, inmate Gregory Cotton opened his "locked" cell door and attacked Granados while Granados was in the dayroom for his hour of recreation. *Id.*, ¶¶19, 32. Granados tried to avoid Cotton but was overpowered. *Id.*, ¶¶33-37. Cotton grabbed Granados, threw him into the cell door, punched him with a closed fist several times, threw him on the floor, then punched him several times with a closed fist. *Id*; *see also* Dkt. No. 61, ¶¶19-20.

The parties dispute whether Deputy Drewitz knew that Cotton posed an imminent threat to Granados prior to the attack. According to Granados, he had attempted to tell Deputy Drewitz that Cotton posed a threat to him for at least 17 minutes before the altercation occurred. *See* Dkt. No. 61, ¶¶5-17. At about 4:30 p.m., Cotton approached him at his cell and threatened to "prop his door open and attack." *Id.*, ¶5. Granados pressed the emergency call button to tell staff about the threat, but the call went unanswered. *Id.*, ¶6. Shortly thereafter, Granados saw Cotton leave his cell, even though his cell was supposed to be locked. *Id.*, ¶7. Granados "began screaming to inform [Deputy Drewitz] of the attacker's threats," but he was "ignored." *Id.* Granados went to the officer's station twice during his recreation time (which began at 4:45 p.m.) to tell Deputy Drewitz about Cotton's threats. *Id.*, ¶¶9-12. Deputy Drewitz responded, "it [the cell door] doesn't seem open, just be cool, and do your hour sir. You're ok." *Id.*, ¶10. As Granados walked back to his cell, he again yelled out that Cotton was "coming out and his door was open." *Id.*, ¶¶15-16. Deputy Drewitz again didn't respond. *Id.*, ¶17. A few seconds later, Cotton was able to get out of his "locked" cell and attack Granados. *Id.*, ¶18. Granados had abrasions on his neck, knees, and back, and ultimately requested therapy for his knee injuries. *Id.*, ¶24.

According to Deputy Drewitz, he didn't know Cotton posed a threat to Granados until he saw the attack through the security camera at 4:47:08 p.m. *See* Dkt. No. 38. Deputy Drewitz did not usually work at the jail and did not know Granados or Cotton or whether there was animosity

2

between the two. *Id*., ¶¶3-5. Granados admits that he had no prior history of animosity with Cotton before the incident. *See* Dkt. No. 67-1 at 5:19-22. Cotton had asked to speak with Deputy Drewitz in private and away from the other inmates at approximately 4:40 p.m. that day (about seven minutes before the attack). Dkt. No. 38, ¶6. Cotton asked for information about money in his jail account and who to write to at the jail to investigate a possible mix-up in deposits. *Id*., ¶¶11-13. Deputy Drewitz answered the question, and Cotton returned to his cell without incident. *Id*., ¶14. By 4:45 p.m., Cotton was back in his cell, *id.*, ¶18, and Deputy Drewitz closed Cotton's cell door using the control panel at the jailer's station. *Id*., ¶15. The control panel did not light up green to reflect the door was closed, but it did not light up to indicate that the door was still open or otherwise unsecured. *Id.*, ¶16. Deputy Drewitz observed the cell door and it appeared fully seated on the rail, completely closed and secure. *Id*., ¶17.

Once Cotton was back in his cell, Deputy Drewitz opened Granados' cell so he could begin his hour of recreation at 4:45 p.m. (about two minutes before the attack). *Id.*, ¶20. Deputy Drewitz states that he did not see Granados try to get his attention before that time; he only saw Granados go back and forth between his cell and the dayroom with a beard trimmer. *Id*., ¶¶21-27. At 4:46:55 (about 13 seconds before the attack), Granados tried to get Deputy Drewitz's attention at the jailer's station to tell him that Cotton's cell door was open. *Id*., ¶¶28-29. Deputy Drewitz looked at the door through the camera and noted that the door appeared closed; he hit a button from the jailer's station to ensure that it was closed. Dkt. No. 67-1 at 7:7-22. Granados admitted to this version of events in his interview with Deputy Drewitz, which was conducted shortly after the incident. *Id*. According to Deputy Drewitz, Granados did not appear to be in any hurry and was rubbing his head. Dkt. No. 38, ¶30. About 13 seconds later, at 4:47:08 p.m., Cotton attacked Granados. *Id*., ¶32. Deputy Drewitz then immediately radioed that there was a fight on 4B and

3

needed assistance. *Id.*, ¶41. About 37 seconds into the attack, at 4:47:45 p.m., Deputy Drewitz and another correctional officer entered the dayroom with Tasers pointed at Cotton and ordered both inmates to return to their cells. *Id.*, ¶¶38-40.

After the altercation, Deputy Drewitz went to Cotton's cell door to examine it. *Id.*, ¶44. The door appeared closed and locked, and he pulled on the door to try to open it. *Id.*, ¶¶45-46. Cotton told Deputy Drewitz to "look out," and Cotton pulled on the door with enough force to open it slightly. *Id.*, ¶46. Deputy Drewitz later found a plastic cap for a travel-sized deodorant stick stuck with pink adhesive in the rail of the cell door. *Id.*, ¶47. It appeared that, with the plastic cap in the rail of the cell door and some force, Cotton was able to pull the door open. *Id.*, ¶¶46, 49. Granados admitted in his interview after the incident that the door appeared closed until he got much closer to Cotton's cell. Dkt. No. 67-1 at 7:15-16. Granados was attacked several seconds after he noticed that the door was open. *Id.* at 7:25-8:1.

Granados returned to GBCI on May 12, 2016. Dkt. No. 61, ¶31. He maintains that, the following day, he sent a letter to Sgt. Gonzales at the Racine County Jail in an attempt to file a grievance about the May 9 altercation, but he did not get a response to the letter. *Id.*, ¶33. About two weeks later, on May 25, 2016, Granados allegedly sent a letter to Sgt. Jacob in an attempt to file a grievance about the altercation, but Sgt. Jacobs did not respond. *Id.* He also sent an "appeal" letter to the "RCJ Captain" on May 25, 2016, but the captain too allegedly did not respond. *Id.*

Lieutenant Jason Yohn, who has recordkeeping responsibilities at the Racine County Jail, reviewed Granados' file and did not find any inmate grievance forms or other inmate requests related to the May 9, 2016 incident. *See* Yohn Dec., Dkt. No. 41, ¶¶2-4, 9. Jail policy and procedure requires that these documents be preserved in the jail file, and if Granados had filed any such documents, they would have been preserved in the jail file pursuant to jail policy. *Id.*, ¶10.

4

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Exhaustion of Administrative Remedies

"[N]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). "To satisfy the exhaustion requirement, an inmate must take each of the steps prescribed by the state's administrative rules governing prison grievances." *See Chambers v. Sood,* 956 F.3d 979, 983 (7th Cir. 2020) (citing *Lockett v. Bonson*, 937 F.3d 1016, 1025 (7th Cir. 2019)). "The primary

5

justification for requiring prisoners to exhaust administrative remedies is to give the prison an opportunity to address the problem *before* burdensome litigation is filed." *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 93–95 (2006); *Schillinger v. Kiley*, 954 F.3d 990, 995–96 (7th Cir. 2020)).

The Racine County Jail outlines its inmate grievance procedure in the Inmate Handbook. Dkt. No. 41-3. Inmates are required to use the grievance procedure to resolve any matter in which the inmate "is personally affected in one of the following ways: health, safety/welfare, disciplinary procedure, facility operation, or availability of services." *Id*. at 13-14, §D. To properly exhaust administrative remedies, the inmate must file a grievance on an Inmate Request Form within seven calendar days of the occurrence. *Id*., §A. Properly submitted grievances are investigated and responded to within fourteen calendar days. *Id*., §G. If a grievance is denied, the inmate may file an appeal with the Jail Captain within seven days after the denial was received. *Id*., §H. If a grievance is appealed and a response is not received within seven days of filing the appeal, the appeal is considered to be denied. *Id*., §I.

Deputy Drewitz contends that he is entitled to summary judgment because Granados did not file any inmate grievances about the May 9, 2016 incident. Although Granados maintains that he sent letters to Sgt. Gonzales, Sgt. Jacobs, and the RCJ Jail Captain in an attempt to file a grievance about the incident, *see* Dkt. No. 61-1 at 15-19, Granados' Racine County Jail file did not contain any grievance forms or other requests related to the May 9, 2016 incident. Deputy Drewitz argues that the Racine County Jail's policy requires that inmate grievance forms or other requests be preserved in the jail file, so if Granados had filed any such documents, they would have been preserved in the jail file.

Deputy Drewitz argues that Granados' "letters" are fabricated and were created for the sole purpose of defeating summary judgment. The Court has reviewed Granados' attached letters

6

and agrees that it is possible that these letters were written during summary judgment briefing in an attempt to defeat summary judgment. The language used in the letters have an air of disingenuousness and appear to parrot the words and arguments raised in Deputy Drewitz's summary judgment brief. In addition, there is no evidence in the record (such as money disbursement receipts or completed mail request slips) establishing that Granados actually mailed these letters in May 2016. The Court need not waste judicial resources to hold an evidentiary hearing to resolve this dispute, however, because Deputy Drewitz is entitled to summary judgment on the merits. *See Fluker v. Cty. of Kankakee*, 741 F.3d 787, 792-93 (7th Cir. 2013) (although a district court must consider exhaustion before reaching the merits, "nothing . . . prohibits a district court's progression from the PLRA defense to the merits if the situation properly calls for it").

**B. Deliberate Indifference**

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of the inmates. *Balsewicz v. Pawlyk*, 963 F.3d 650, 654-55 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). To prevail on an Eighth Amendment deliberate indifference claim, Granados must establish that: (1) he was exposed to a harm that was objectively serious; and (2) Deputy Drewitz knew of and disregarded an excessive risk to his health or safety. *Id*. More specifically, Deputy Drewitz must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he must have "drawn that inference." *Id*. at 655 (quoting *Farmer*, 511 U.S. at 837).

The Seventh Circuit has held that a prison official will be liable for failing to protect an inmate when an inmate suffers an attack only if the prison official "effectively condones the attack by allowing it to happen." *See Santiago v. Walls,* 599 F.3d 749, 756 (7th Cir. 2010). Negligence and even gross negligence are insufficient to establish a failure to protect claim. *Grieveson v.*

7

*Anderson,* 538 F.3d 763, 777 (7th Cir.2008). A defendant is not liable if he takes reasonable measures to abate a known risk even if the risk is not averted. *Farmer*, 511 U.S. at 844.

While the parties do not dispute that Granados was exposed to an objectively serious risk of harm when Cotton attacked him, Granados has not established that Deputy Drewitz knew of an excessive risk to Granados' health or safety and disregarded it. Granados maintains that Deputy Drewitz failed to protect him because he tried to tell Deputy Drewitz for 17 minutes that Cotton's cell door was "open" and that Cotton had threatened to attack him. But telling Deputy Drewitz about a possible risk of harm is not enough to prevail at summary judgment; Granados must also establish that Deputy Drewitz actually perceived that risk of harm and deliberately disregarded it. No reasonable jury could arrive at that conclusion because Deputy Drewitz responded to Granados' concerns by checking Cotton's cell door and reasonably believed the door was locked.

Deputy Drewitz states that from 4:30 and 4:45 p.m., he did not hear Granados screaming from his cell or see Granados trying to get his attention from the jailer's station. Granados does not have any evidence to dispute this. Indeed, Granados was in his cell at the time, so he has no personal knowledge of what Deputy Drewitz did or did not see or hear while he was in the jailer's station. In any event, after Granados went to the jailer's station between 4:45 and 4:47 p.m. and told Deputy Drewitz that Cotton's cell door was open, Deputy Drewitz looked at Cotton's cell door through the camera, checked to see if the door was open, and said, "it doesn't seem open." Deputy Drewitz then pressed a control panel button in the jailer's station to ensure that the door was closed and secured. After Granados left the jailer's station, he had not noticed that Cotton's cell door was open until he got much closer to the cell, at which point he was attacked.

Based on this record, no reasonable jury could conclude that Deputy Drewitz was actually aware that Cotton's cell door was open and disregarded the risk of possible attack. Deputy

8

Drewitz's conduct was well within the bounds of reason in light of the short amount of time that passed between the interaction at the jailer's station and the attack. Deputy Drewitz also responded promptly when he saw the fight, and the entire altercation was over in 37 seconds. Deputy Drewitz is therefore entitled to summary judgment on the merits and the Court will dismiss this case.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment (Dkt. No. 37) is **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 10th day of February, 2021.

    s/ William C. Griesbach
    William C. Griesbach, District Judge
    United States District Court